1
2
3
4
5

# UNITED STATES DISTRICT COURT

6

## SOUTHERN DISTRICT OF CALIFORNIA

7

8  | HENRY KODIMER, by an through his          | Case No. 07-CV-2221-BEN (NLS)
9  | guardian ad litem LYN RAMSKILL,

10 |                                Plaintiff,  | **ORDER RE: DEFENDANTS'**
   |    vs.                                     | **MOTION FOR SUMMARY**
11 |                                            | **JUDGMENT**

12 | COUNTY OF SAN DIEGO, ELLEN
13 | TANACIO, JAMES WEST, and DR. EARL
   | GOLDSTEIN, M.D.,
14 |
   |                               Defendants.[1]
15

16

17

## I.  BACKGROUND

18       Now before the Court is the County of San Diego and its named employees' joint Motion

19  for Summary Judgment.  Previously, Plaintiff Henry Kodimer, by and through his mother and

20  guardian *ad litem*, named several City of Escondido police defendants and County of San Diego

21  detention center defendants in his Third Amended Complaint setting forth twelve federal and state

22  claims for relief.  On July 6, 2009, all of the City of Escondido defendants were dismissed and the

23

24  related claims One through Five were dismissed.  On December 22, 2009, the remaining County of

25  San Diego defendants jointly moved for summary judgment.  In response, Plaintiff has agreed to

26

27  _____

28       [1]The caption has been changed to reflect the dismissal of the City of Escondido defendants,
    the substitution of three "Doe" defendants with named defendants, and the dismissal of four County
    of San Diego employee defendants.  F.R.C.P. 1 and 10(a).

07cv2221

dismiss four individual County defendants (Nichols, Cruz, Torkelson and Ndugga-Kabuye),[2] and has abandoned his seventh and twelfth claims for relief.  As a result, the remaining defendants are: (1) the County of San Diego; (2) Ellen Tanacio, RN; (3) Deputy James West; and (4) Earl Goldstein, M.D.  The remaining claims for relief are claims six and eight through eleven.  As discussed below, the motion for summary judgment is denied as to defendants Tanacio, West, and the County of San Diego, and granted in favor of defendant Goldstein, M.D.

## II.  FACTS

The following facts are taken from the Third Amended Complaint and are recited here for background and context.[3]

Plaintiff was severely injured while a pretrial detainee at a San Diego County detention center.  At the time of his injury, Plaintiff was a 35-year-old male who had suffered from acute paranoid schizophrenia for some time.  He was being treated by a psychiatrist and he had been prescribed several psychiatric medications.  Plaintiff was living with his mother.  On February 16, 2007, Plaintiff was behaving erratically.  Concluding that he was suffering a psychotic break, Plaintiff's mother called the police so they could transport Plaintiff to an emergency mental facility for treatment.  When City of Escondido police officers arrived at the home, Plaintiff's mother informed them of Plaintiff's unusual behavior and advised them of Plaintiff's history of paranoia and schizophrenia.  She gave the officers several containers of Plaintiff's daily psychiatric medications, and asked them to transport Plaintiff to a mental facility for treatment and to ensure that his medications be administered as soon as possible.

For reasons not altogether clear from this record, rather than taking him to a psychiatric

---

[2]See Plaintiff's memorandum in opposition, n.1 (filed January 11, 2010).

[3]These are not formal findings of fact.

facility, the police officers arrested Plaintiff for attempted rape upon his mother and transported him to the San Diego County Sheriff's detention facility in Vista, California.  There, instead of treating Plaintiff or transferring him to an emergency mental health hospital, Plaintiff was placed in a large population jail space and assigned an upper bunk.

Plaintiff was first screened by County of San Diego jail employee, Defendant Ellen Tanacio, RN.  Tanacio referred Plaintiff to County of San Diego jail employee, Defendant Deputy James West, for classification and a housing assignment.  Deputy West assigned Plaintiff to an area with bunk beds, glass walls, and approximately fifty other inmates.  The prescribed psychiatric medications were not provided to Plaintiff until at least one day later.  He was never seen by a mental health professional, though a psychiatrist for the jail was on call around the clock.  On February 18, 2007, Plaintiff either fell, dove, or was pushed from his top bunk.  The fall caused Plaintiff to break his neck rendering him quadriplegic.

### III.  STANDARD OF REVIEW

The standards to be used in evaluating a motion for summary judgment are well known and need not be repeated in detail here.  The main point is this: summary judgment is appropriate only if there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law.  F.R.C.P. 56(c).  "A material issue of fact is one that affects the outcome of the litigation and requires a trial to resolve the parties' differing versions of the truth."  *S.E.C. v. Seaboard Corp.*, 677 F.2d 1301, 1306 (9th Cir. 1982).  The moving party has the initial burden of demonstrating that summary judgment is proper.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  If the moving party can identify evidence that demonstrates the absence of a genuine issue of material fact, then the burden shifts to the opposing party to produce evidence creating a genuine issue of fact.  If genuine issues exist, then summary judgment is not appropriate.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).

The opposing party's evidence is to be believed, and all justifiable inferences are to be drawn in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The party opposing summary judgment must identify facts showing there is a genuine issue for trial. *Butler v. San Diego Dist. Attorney's Office*, 370 F.3d 956, 958 (9th Cir. 2004) (stating that if defendant produces enough evidence to require plaintiff to go beyond pleadings, plaintiff must counter by producing evidence of his own).

**IV.  DISCUSSION**

**A.  Claim Six**[4]

In Claim Six, Plaintiff alleges that individual defendants Tanacio RN, Deputy West, and Goldstein M.D., violated his federal constitutional civil rights at the Vista Detention Center by failing to provide any care for his serious psychiatric needs. The defendants move for summary judgment arguing that there is no evidence that they were deliberately indifferent to Plaintiff's psychiatric needs.

Because Plaintiff was a pretrial detainee, his federal constitutional protections flow from the Due Process Clause of the Fourteenth Amendment. *Conn v. City of Reno*, 591 F.3d 1081, 1094 (9th Cir. 2010), *pet'n for cert. filed*, No. 09-1361, 78 USLW 3670 (May 6, 2010); *Simmons v. Navajo County*, __ F.3d __, 2010 WL 2509181 (9th Cir. June 23, 2010) (same). "An official's deliberate indifference to a substantial risk of serious harm to an inmate – including the deprivation of a serious medical need – violates the Eighth Amendment, and a fortiori, the Fourteenth Amendment." *Id.* (citing *Farmer v. Brennan*, 511 U.S 825, 828 (1994)). The Ninth Circuit has "long analyzed claims that correction facility officials violate[] pretrial detainees' constitutional rights by failing to address their medical needs (including suicide prevention) under

---

[4]Claims one through five were previously dismissed.

a 'deliberate indifference' standard." *Simmons*, 2010 WL 2509181 at *4 *(*quoting *Clouthier v. County of Contra Costa*, 591 F.3d 1232, 1241 (9th Cir. 2010)). Thus, the constitutional claim requires proving two elements: (1) subjective awareness of a serious medical need; and (2) deliberate indifference. "In other words, a plaintiff must show that the official was '(a) subjectively aware of the serious medical need and (b) failed adequately to respond.'" *Id.* (quoting *Conn*, 591 F.3d at 1096).

For federal constitutional purposes, a serious medical need includes a serious psychiatric need. *Gibson v. County of Washoe, Nev.*, 290 F.3d 1175, 1187 (9th Cir. 2002) ("The duty to provide medical care encompasses detainees' psychiatric needs."). To carry out the duty "not to engage in acts evidencing deliberate indifference to inmates' medical and psychiatric needs," a jail must provide "medical staff who are competent to deal with prisoner problems." *Id.*

Plaintiff has produced evidence that he had a serious medical need at the Vista Detention Center. There is no dispute that he was suffering from chronic paranoid schizophrenia, that he was being treated by a psychiatrist, and that he was taking several prescribed psychiatric medications to help control his illness. There is likewise no dispute that he was behaving unusually on the day of his arrest. The unusual behavior was the cause for both the summoning of the police and the resulting criminal charge and arrest. Defendants do not contend that Plaintiff was not suffering from a serious medical or psychiatric need. Their motion goes to the second element.

Defendants assert that there is no evidence of deliberate indifference. In support, they point to their own declarations as evidence that they were unaware that Plaintiff was in the throes of a psychotic break. Summary judgment, however, is unwarranted if based simply on Defendants' declarations as to their own state of mind. *Conn*, 591 F.3d at 1097. "Proof of 'subjective awareness' is not limited to the purported recollections of the individuals involved." *Id.* In this case, a genuine issue exists. Plaintiff has produced evidence from which a jury could

conclude that Defendants knew of his serious psychiatric need and were deliberately indifferent from the fact that the need was obvious.  *E.g.*, *Conn*, 591 F.3d at 1097  ("Here, there is sufficient circumstantial evidence to create a genuine issue of fact regarding defendants' subjective awareness of [plaintiff's] serious medical need.").

### 1. Nurse Tanacio

There is evidence that Tanacio was on duty as the screening nurse at the detention center when Plaintiff arrived.  There is evidence that she interviewed Plaintiff face-to-face.  Her intake records show that Plaintiff told her he suffered from paranoid schizophrenia and that  Plaintiff told her the name of his treating psychiatrist.  There is evidence that she took notice and recorded the four or five psychiatric medications Plaintiff had been prescribed.  There is evidence that Tanacio understood that Plaintiff would not be taking the medications until sometime later when he was cleared to do so by a jail physician.

There is no direct evidence that she was aware of Plaintiff's unusual behavior prior to his arrest.  However, a jury could reasonably infer from the availability of the arrest report that she knew or deliberately avoided knowing about the unusual pre-arrest conduct of Plaintiff.  Plaintiff's expert, Terry Kupers, M.D., opines that paranoid schizophrenia is the most severe of mental illnesses.  He opines that a health professional knows that a person "with paranoid schizophrenia who [is] taking strong doses...of antipsychotic medications" is "someone with a severe disorder." Kupers opines that Plaintiff was in acute psychiatric decompensation at the time of his arrival at the detention center.  Kupers opines that  Tanacio "failed to cull the available facts."  He opines further that there were a large number of suicide risk factors present with Plaintiff and that there was a "very large failure" in regard to Tanacio's disregard of Plaintiff's pre-arrest behavior.

With evidence similar to this, the *Gibson* court concluded a jury could find that a jail nurse was deliberately indifferent to a serious psychiatric need of a pretrial detainee like Plaintiff.

A jury could find that the nurse knew that Gibson was in the throes of a manic state on the basis of three facts: she had medical training, she knew that Gibson was exhibiting behavior consistent with mental illness, and she knew that Gibson possessed psychotropic medication 'that would stabilize somebody.'  A jury could also conclude that a trained nurse would know that hospitalization could have relieved Gibson's condition, and that if Gibson remained in jail, he presented a danger both to himself and to others.  If the nurse knew that a substantial risk to Gibson's health existed and she declined to act upon this knowledge, she was deliberately indifferent to Gibson's constitutional right to receive medical care.

*Gibson*, 290 F.3d at 1194.   Tanacio could have required Plaintiff be placed in an isolation cell.

She could have called for an immediate psychological evaluation by the detention center's on-call

psychiatrist.  She could have directed that Plaintiff be transported to an emergency psychiatric

facility for treatment.  Instead, she scheduled him for a mental evaluation in two weeks and handed

off Plaintiff to the classification deputy for a housing assignment.  Therefore, there is at least a

genuine issue which exists as to this material fact.  It is sufficient to defeat the motion for summary

judgment by Defendant Tanacio.

### 2. Deputy West

Defendant West was on duty as the classification deputy when Plaintiff was brought to the

Vista Detention Center.  Once  Tanacio screened Plaintiff for medical and psychiatric needs, since

he was not sent to a psychiatric facility or held for evaluation by a mental health specialist, he was

referred to Deputy West for placement.  Deputy West also spoke with Plaintiff face-to-face for the

purpose of deciding placement and appropriate housing.  In arguing for summary judgment, West

says he simply followed policy and that he did not know of Plaintiff's diagnosis of paranoid

schizophrenia.  He says he was unaware of the "psych hold" placed on Plaintiff by  Tanacio.  He

says he was unaware of the need to consider Plaintiff's paranoia or schizophrenia in deciding

whether to house him in a large room with many prisoners or a smaller protective cell.

Conducting his interview of Plaintiff sometime after midnight on Saturday, February 17, 2007, he

says he did not observe Plaintiff to be in need of immediate medical care and that he did not have

access to his inmate medical records.  He says that Plaintiff did not tell him that he needed to be away from other inmates or that he had any concerns about being in jail.  Deputy West decided to place Plaintiff in a dormitory-style setting with bunk bed space for 51 inmates and glass walls. The glass walls permit deputies to see the inmates in their bunks, in the eating areas, in the lavatory and in the showers.  Deputies actually enter the area only once an hour and there is no evidence that any deputy checked on Plaintiff.  Deputy West described this setting as "protective custody."

Defendant West could have re-classified Plaintiff because of his psychiatric needs, but he did not.  West could have communicated with  Tanacio, but he did not.  West could have placed Plaintiff on a bottom bunk or a single bunk observation cell, but he did not.  Plaintiff's expert, Dr. Kupers, opines that "placing someone with [Plaintiff's] level of extremity in terms of his psychosis and in terms of the bizarreness of his act in a dorm, even in protection, is a dangerous proposition."  Plaintiff's expert, George Sullivan, opines, "[w]hen you have protective custody, normally you're protecting the individual from other individuals, and that usually means a private cell or a cell with one or two others, not in a dormitory with 50-plus other people."  In Sullivan's opinion, "contemporary jail standards dictate that Henry [Kodimer] be placed in a jail mental health unit and that he be placed on 15-minute mental health watch."  Dr. Kupers opines that an arrestee's mental illness should play a large part in the classification decision.  "[T]he presence of a mental illness should be a very important part of the classification process so that people with mental illness are not victimized or do not victimize others," according to Kupers.  Kupers opines that, "[a] huge error was made here....A classification was made...without mental illness determining the classification and the housing."  In Kupers' opinion, Deputy West did not do the simplest, safest, or most obvious thing he could have done.  "[T]he simplest thing he could have done is go back to Ms. Tanacio and [say], 'Are you aware of the bizarre crime that led to his being

07cv2221

sent here?  Is it safe for me to put him in a room with other prisoners?'" "That would have been the safest and most obvious thing for Deputy West to have done....Deputy West could have intervened and corrected the problem."

Plaintiff's evidence is such that a jury could conclude that Deputy West knew of Plaintiff's pre-arrest unusual behavior (since he based the jail housing decision upon the police reports), but that he was deliberately indifferent to Plaintiff's mentally ill condition.  A jury could conclude that in deciding to house Plaintiff with numerous other prisoners, on a bunk bed, without discussing the case with Tanacio or another mental health expert, Deputy West was deliberately indifferent. Therefore, there are genuine issues of material fact which preclude summary judgment for Defendant Deputy West.

For constitutional purposes, a serious medical need includes a serious psychiatric need. *Gibson*, 290 F.3d at 1187 ("The duty to provide medical care encompasses detainees' psychiatric needs.").  To carry out the duty "not to engage in acts evidencing deliberate indifference to inmates' medical and psychiatric needs," a jail must provide "medical staff who are competent to deal with prisoner problems." *Id.*  "[Q]uestions involving a person's state of mind are generally factual issues inappropriate for resolution by summary judgment." *Conn,* 591 F.3d at 1098; *see also Gordon v. Washington*, Case No. CV-09-05069RBL, slip op., 2010 WL 1406166 (W.D. Wash. Apr. 2, 2010) (denying jail physician's summary judgment motion, relying on *Conn,* because physician's actual knowledge of pretrial detainee's suicide risk was question to be left to the jury).

Defendants have not moved for summary judgment arguing a lack of causation or a lack of damages.  As a matter of law, the requisite causal connection can be established by demonstrating that a defendant set in motion "a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury." *Conn*, 591 F.3d at 1098.

07cv2221

Like the *Conn* case, here Plaintiff puts forth evidence from which a jury could infer that if medical staff had not indifferently evaluated him, and instead directed him to a mental hospital or emergency mental facility, he almost certainly would have received the care he needed, rather than facing jail conditions that worsened his acute psychotic break. *Id.* at 1100. Consequently, there is enough evidence of causation to escape summary judgment.

Likewise, there is enough evidence of damages to preclude summary judgment. Certainly, Plaintiff suffered damages when his bunk bed fall resulted in paraplegia. But this is not the only type of compensable damages. Plaintiff also likely suffered worsening psychological injury as a result of the withholding of his medications and being housed with numerous other inmates without attention from a mental health professional. As the court in *Gibson* noted with regard to deliberate indifference to a detainee suffering a manic episode that ended in a fatal heart attack, death was not the only form of damages. Psychological and physiological damages may be recovered from jailers for the harm that flows from not immediately treating a severe mental illness. *Gibson*, 290 F.3d at 1192 ("A plaintiff may recover from a municipality for far less severe injuries in a suit of this nature.").

### 3. Dr. Goldstein

Defendant Goldstein, M.D., is another matter. Goldstein argues that he had no personal involvement in any of the decisions concerning Plaintiff's treatment. A supervisor ordinarily will not be held vicariously liable for the constitutional torts of those under his supervision where he has no direct involvement. Plaintiff makes little mention of Goldstein in opposing summary judgment. Moreover, there is no evidence in the record that Goldstein knew anything about Plaintiff or Plaintiff's arrival at the Vista Detention Center. Therefore, summary judgment is granted in favor of Defendant Goldstein.

**B.  Claim Seven**

Plaintiff waives his right to proceed on Claim Seven, which alleges that Defendants failed to intervene to prevent a civil rights violation.  Therefore, Defendants' motion for summary judgment is granted as to this claim.

**C.  Claim Eight**

In Claim Eight, Plaintiff alleges that the County of San Diego violated his federal constitutional civil rights by failing to properly train and supervise its jail employees.  A person in Plaintiff's shoes may recover from a county under 42 U.S.C. §1983 for failing to prevent harm under three theories of municipal liability.  To be liable for failing to adequate train its jail employees, a county's omission must amount to deliberate indifference to a constitutional right. *Clouthier*, 591 F.3d at 1249.  "The standard is met when 'the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need.'" *Id.* (quoting *City of Canton v. Harris*, 489 U.S. 378, 390 (1989)).

The County moves for summary judgment offering evidence of training.  For example, it points out that  Tanacio received an eight-hour training class concerning psychiatric behavior in custody, and that jail staff is trained to inspect and inventory an arrestee's medications.  On the other hand, Plaintiff offers Dr. Kupers' opinion that an eight-hour training class is plainly inadequate for a jail screening nurse.  Kupers opines, "[e]ight hours of psychiatric training for a nurse who is going to be assessing individuals who may enter the jail with psychiatric problems on its face is not adequate....I know from my own experience that you cannot learn what you need to know about psychiatric problem people within an eight hour span of time."

The County also points out that Deputy West received two months of classification training under a training officer.  West's testimony, however, does not mention training about how

to recognize or classify a person with a severe mental illness.  He described his training as follows:

> [i]t entailed on [sic] how to access the various [computer] programs that we're – that we utilize.  It entailed various duties the we did, such as , you know, transferring people, who can go where, when, how.  All the various duties that the classification job entails, we were trained on.

There is no evidence that Deputy West or other jail classification officers received any training on how to identify arrestees with severe mental illness.  There is no evidence jail classification officers received training on how to select cell housing in ways to prevent harm to arrestees suffering from mental illness.

On the other hand, Plaintiff points to the expert opinion of Dr. Kupers as evidence the County failed to train jail employees on mental illness issues.  Kupers opines that staff at the jail were not properly trained to recognize suicidal signs.  Similarly, Kupers opines that state law requires classification officers in California to "have eight hours of training originally and two hours a year of continuing education on mental illness."  Kupers opines that for detention center classification officers, the presence of a mental illness should be a very important part of the classification decision making.  Tanacio testifies that, in her experience, 20 to 40 % of arrestees at the Vista Detention Center suffer from mental illness.  The County of San Diego offers no evidence that Deputy West was trained to classify detainees suffering from severe mental illness in such a way as to prevent causing harm.  Plaintiff, on the other hand, offers expert evidence that classification deputies should be trained and have ongoing annual training in how to classify detainees with mental illness and that the training by the County was inadequate.

The Plaintiff has made an adequate showing that, had the County adequately trained its intake staff to recognize and classify mentally ill detainees, a violation of Plaintiff's constitutional rights would probably have been avoided.  *Conn*, 591 F.3d at 1103.  Drawing all inferences in favor of the Plaintiff, a genuine issue exists as to whether a reasonable jury could conclude that the

Defendant County's failure to train medical screening and classification employees was so obvious and the inadequacy so likely to result in serious harm to mentally ill detainees, that the Defendant County's motion for summary judgment must be denied. *Cf. Clouthier*, 591 F.3d at 1252 (county granted summary judgment on failure to train claim where evidence was that all new deputies were required to complete *eight-week* training course and annual refresher course about people with mental disorders, and mental health staff are licensed mental health practitioners with graduate degrees and continued training).

**D.  Claim Nine**

In Claim Nine, Plaintiff again alleges the County of San Diego violated his civil rights by the adoption of policies and procedures which authorized the failure to provide medically necessary care and housing to mentally ill inmates.[5]  The County moves for summary judgment simply arguing that its policies are constitutional.  Neither side makes much effort in arguing for or against summary judgment on this claim.  Perhaps that is because for a *Monell* claim, the Ninth Circuit has emphasized, "Whether a local government has displayed a policy of deliberate indifference to the constitutional rights of its citizens is generally a jury question." *Long v. County of Los Angeles*, 442 F.3d 1178, 1190-91 (9th Cir. 2006) (quoting *Gibson*, 290 F.3d at 1194-95). Nevertheless, to succeed on a motion for summary judgment, the moving party has the initial burden of showing the absence of any genuine issue of material fact.  *Id.* at 1185.

County liability for an unlawful policy requires a plaintiff show three things: (1) that a county employee violated the plaintiff's constitutional rights; (2) that the county policy amounts to deliberate indifference; and (3) that the policy was "the moving force behind the employee's

---

[5]  Plaintiff describes this as a "*Monell* Claim" referring to *Monell v. Department of Social Services*, 436 U.S. 658 (1978).  Under *Monell*, a county may be liable under §1983 for injuries it inflicts through deliberate indifference.  *Conn*, 591 F.3d at 1102.

07cv2221

violation of constitutional rights." *Conn*, 591 F.3d at 1102 (quoting *Long*, 442 F.3d at 1186).

Because Defendants' motion for summary judgment is being denied on the constitutional claims in

Claim Six against  Tanacio and Deputy West, the first prong is satisfied for purposes of summary

judgment on the policy claim against the County.  *E.g., Conn*, 591 F.3d at 1102-03 (same).

It bears repeating that a court must view the evidence in the light most favorable to the

non-moving party.  *Long*, 442 F.3d at 1185.  In this case, that means the record is evaluated in the

light most favorable to the Plaintiff.  There may be enough evidence to support a defense motion,

but if after reviewing all of the evidence there remains a genuine issue, then summary judgment is

unwarranted and a jury must decide what happened.  Applying that standard here, there is enough

evidence of a County policy of deliberate indifference in the process of screening incoming

detainees with severe mental illness and in the process of classifying them for purposes of cell

housing to raise a genuine issue for a jury to resolve.

Plaintiff's evidence demonstrates the following case.  Plaintiff's mother called 911 because

Plaintiff had a severe mental illness and was acting in such an unusual way that she was

frightened.  Police arrived and also found Plaintiff acting in an unusual way.  Plaintiff's mother

informed the officers that Plaintiff has a long history of suffering from paranoid schizophrenia, is

being treated by a psychiatrist, has been taking several psychiatric medications, and needs

immediate mental health treatment.  The police officers arrested Plaintiff for attempted rape and

false imprisonment of his mother and wrote reports.  The officers were handed the bottles of

psychiatric medications for transport with Plaintiff.  When Plaintiff was presented to the County's

Vista Detention Center, he was suffering from an acute psychiatric decompensation with denial of

symptoms.  The medical screening nurse, in accordance with County policy, had received only

eight hours of training on how to screen detainees with mental illnesses, although 20 to 40 % of

detainees have a mental illness.  Expert testimony is that eight hours of training is inadequate on

- 14 -

its face.

There is evidence that it was jail policy for the screening nurse to deliberately *avoid* learning about a detainee's pre-arrival behavior or the charged criminal conduct even when mental illness is suspected.  There is expert evidence that Plaintiff's alleged criminal conduct was of a type that is so bizarre that it is most likely the conduct of a person with schizophrenia in an acute state of decompensation.  There is expert opinion that the bizarre pre-arrest conduct should have been communicated to, and considered by, the jail screening and classification personnel.  There is evidence that the screening nurse, as a matter of county policy, used an inadequate, yes-or-no type of mental illness questionnaire that accepts at face value a detainee's denial of suicidal ideation. There is evidence that as a result of the questionnaire, plaintiff related to the screening nurse that he had a history of paranoid schizophrenia, that he was being cared for by a psychiatrist, the name of the psychiatrist, that he was taking four or five psychiatric medications, and that he was not suicidal.  Expert evidence explains that mentally ill detainees will often deny suicidal ideation in open jail settings and is not useful in evaluating suicide risk.  There is evidence that the screening nurse as a matter of County policy withheld prescribed psychiatric medications from Plaintiff. While the policy prevents a mentally ill detainee from overdosing, it also creates a potential under-dosing situation.  Under-dosing for individuals who need the medications may suffer mental and physical effects from sudden discontinuation of long-term dosing.  While far from clear on this record, there is evidence that Plaintiff was unable to take his prescribed psychiatric medications for a period of 36 to 48 hours.  There is evidence that the screening nurse, as a matter of County jail policy, did not relay to the classification deputy that Plaintiff had a mental illness.

There is evidence that Deputy West, the classification deputy assigned to Plaintiff, was not informed of Plaintiff's schizophrenia or paranoia or the need for prescribed medications.  There is evidence that County classification deputies do not, and in fact are not able to, access the medical

07cv2221

information about a detainee awaiting a housing assignment.  There is evidence that classification Deputy West did consider (for purposes of housing) Plaintiff's pre-arrest conduct, *i.e.*, the attempted rape of his mother.  At the same time, there is evidence that Deputy West did not consider the pre-arrest conduct to be indicative of acute psychiatric decompensation by one suffering from severe schizophrenia.  There is no evidence that Deputy West had eight hours of state-mandated training in classifying detainees with mental illnesses or that the he was receiving state-mandated annual refresher training.

To sum up, the evidence suggests that county policy permitted screening nurses and classification deputies to work while lacking essential training in caring for detainees with severe mental illness.  Evidence demonstrates that county policy imposed barriers to communication between arresting officers, screening nurses, and classification deputies.  Plaintiff's evidence shows that county policy was deliberately indifferent to Plaintiff's serious psychiatric needs and was the moving force behind his suffering leading up to and including his fall from the top tier jail bunk bed.  Plaintiff's evidence is at least sufficient to create genuine issues of fact on the second and third elements of §1983 liability and require the County's motion for summary judgment be denied.

Deliberate indifference is a high legal standard and a showing of simple medical malpractice or jailer negligence is not enough to establish a constitutional deprivation under the Fourteenth Amendment Due Process Clause.  *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004).  But here, Plaintiff has put forth sufficient evidence to create genuine issues of material fact as to whether the County's policy impinged on his pre-trial detainee Due Process right to be free from deliberately indifferent treatment of his serious mental health needs.

**E.  Claim Ten**

Claims Ten and Eleven allege state law claims.  Claim Ten alleges simple common law

negligence against individual defendants Tanacio, West, and Goldstein.  California has recognized that a jailer owes a prisoner a duty of care because of the special relationship which exists between jailer and prisoner.  *Giraldo v. California Dep't of Corr. and Rehab.*, 85 Cal. Rptr. 3d 371, 387 (Cal. Ct. App. 2008).  A plaintiff may maintain a negligence action under California law against individual government employees for breach of a legal duty.  *See, e.g.*, Cal. Gov. Code § 844.6(d) ("Nothing in this section exonerates a public employee from liability for injury proximately caused by his negligent or wrongful act or omission."); Cal. Gov. Code § 855.8(d) ("Nothing in this section exonerates a public employee from liability for injury proximately caused by his negligent or wrongful act or omission in administering any treatment prescribed for mental illness or addiction."); *see also Avila v. Citrus Cmty. Coll. Dist.*, 41 Cal. Rptr. 3d 299 (Cal. Ct. App. 2006) ("By statute, the Legislature has extended this common law standard of tort liability to public employees and has extended liability for public employees' negligent acts to public entity defendants.").

Defendants argue that the evidence shows due care on their part.  It may well.  However, these are questions of fact to be decided at trial, rather than on summary judgment.  *Zeilman v. County of Kern*, 168 Cal. App. 3d 1174 (Cal. Ct. App. 1985), a decision Defendants cite, observes: "In all cases it seems abundantly clear that the issues of the governmental entity's actual or constructive knowledge of an individual's immediate need for medical care and of the reasonable action of the governmental entity to provide such care are questions of fact."  Being questions of fact where genuine issues exist, summary judgment is unwarranted.

This is also true for the question of proximate causation.  *Id.* ("Moreover, we are not persuaded by defendant's argument that the issue of proximate causation can be decided as a matter of law....plaintiff in the instant case may well have a difficult time proving her claim against the county.  But difficulty in proof does not equate to resolution as a matter of law."); *see also*

07cv2221

*Estate of Abdollahi v. County of Sacramento*, 405 F. Supp. 2d 1194, 1215 (E.D. Cal. 2005) ("California courts have recognized that questions about jail personnel's actual or constructive knowledge of a prisoner's need for immediate medical care as well as the reasonableness of actions taken to meet this need are factual questions most appropriately decided by a jury.").

The exception, again, is Defendant Goldstein, M.D.  Since there is no evidence that he breached his duty of care toward Plaintiff, he is entitled to summary judgment on claim Ten.

**F.  Claim Eleven**

In claim Eleven, Plaintiff asserts a state law claim against individual Defendants Tanacio, West, and Goldstein, and the County of San Diego for neglecting to summon immediate medical care.  California Government Code Section 845.6 provides, in pertinent part:

> Neither a public entity nor a public employee is liable for injury proximately caused by the failure of the employee to furnish or obtain medical care for a prisoner in his custody; *but*, except as otherwise provided by Sections 855.8 and 856, *a public employee, and the public entity* where the employee is acting within the scope of his employment, *is liable if the employee knows or has reason to know that the prisoner is in need of immediate medical care and he fails to take reasonable action to summon such medical care*.

Cal. Gov. Code § 845.6 (emphasis added).  In the words of one court, "section 845.6 . . . could not be clearer.  It creates liability both in the county and its agents, under the circumstances specified, in unambiguous language." *Sanders v. Yuba County*, 247 Cal. App. 2d 748, 750 (1967).  This section "*creates* liability . . . which does not otherwise exist under the common law." *Johnson v. County of Los Angeles*, 143 Cal. App. 3d 298, 317 (1983) (emphasis in original); *Hart v. Orange County*, 254 Cal. App. 2d 302, 306-07 (1967) (describing the "duty of 'reasonable action to summon' medical care" as "the moral obligation of common decency and common humanity, to come to the aid of another human being who is in danger"); *see also Haley v. County of Del Norte*, Case No. C-08-04572 WHA, slip op., 2009 WL 3568897 (N.D. Cal. Oct. 30, 2009) ("In *Jett* [*v. Penner*, 439 F.3d 1091 (9th Cir. 1996)] the Ninth Circuit addressed exactly what is expected of jail

officials in providing medical care to prisoners under Section 845.6:  We hold the term "immediate medical care" as used in [Section 845.6] includes both diagnosis and treatment.... [I]f the California Legislature intended the duty of summoning immediate medical care to be limited only to diagnosis or to the first time there was need for treatment for a serious medical condition, it would have specified such.").

Generally, this type of claim is not ripe for summary judgment.  Questions of a jail employee's knowledge of an inmate's need for immediate psychiatric care and the nature of the care which should have been summoned, "are questions of fact to be determined at trial." *Johnson*, 143 Cal. App. 3d at 317.  Plaintiff has put forward evidence from which a jury could find that  Tanacio or Deputy West violated the state law statutory duty to summon medical care for Plaintiff while in the Vista Detention Center.  Defendants may argue that housing Plaintiff in the conditions which they selected constituted "reasonable action" in summoning care.  They will have the opportunity to demonstrate as much at trial.  But at the very least, there is a genuine issue of triable fact as to whether such action was reasonable or not.  *E.g. Haley*, 2009 WL 3568897 at *12.  Consequently, summary judgement on claim Eleven is denied as to Defendants Tanacio and West.

This is not the case as to Defendant Goldstein.  There is no evidence that Goldstein knew of Plaintiff's need for immediate psychiatric care. Therefore, summary judgment is granted as to Defendant Goldstein.

Finally, California "imposes liability on counties under the doctrine of respondeat superior for acts of county employees." *Robinson v. Solano County*, 278 F.3d 1007, 1016 (9th Cir. 2002); *see also* Cal. Gov. Code § 815.2(a) ("A public entity is liable for injury proximately caused by an act or omission of an employee of the public entity within the scope of his employment if the act or omission would, apart from this section, have given rise to a cause of action against that

employee").  Therefore, if any of the individual defendants are found liable, the County of San Diego could be found liable.  Accordingly, as to Claim Eleven, the County's motion for summary judgment is denied.

## V.  CONCLUSION

This is not a case where summary judgment was warranted because the evidence showed that a month had elapsed since a jail detainee had arrived, during which time he had received counseling, took antidepressants, was doing better, and had been on suicide watch since his arrival.  *E.g., Simmons*, 2010 WL 2509181, at *5.  It is closer to a case for which summary judgment was improper where a jail screening nurse knew a detainee was in substantial danger of suicide but deliberately ignored the risk.  *E.g., Clouthier*, 591 F.3d at 1248.  It is also closer to a case for which summary judgment was improper where an arrestee demonstrated a serious psychiatric need when she tried to kill herself and transporting police officers and the county policies on suicide prevention were deliberately indifferent and violated of the arrestee's federal constitutional rights.  *E.g., Conn*, 591 F.3d at 1105.

Therefore, summary judgment is DENIED as to defendants Tanacio, West, and the County of San Diego.  Summary judgment is GRANTED in favor of defendant Goldstein on all claims.

The Pre-trial Conference shall take place on August 9, 2010 at 10:30 a.m. in Courtroom 3. All parties are directed to the scheduling order entered May 5, 2010 for other pertinent pre-trial deadlines.

IT IS SO ORDERED.

DATED:  June 30, 2010

Hon. Roger T. Benitez
United States District Judge

07cv2221